Cases Davis v. Legal Services Alabama, Inc., and we'll hear first from Mr. Buckley. Thank you, Your Honor. Good morning. It's great to be back in front of the Eleventh Circuit. It's great to have you here. So, and I have actually argued two prior adverse employment action cases, Crawford v. Carroll, which I'm sure the Court knows, and Gillis v. Department of Corrections. So, this is yet another one. And what this case is about, it's a mixed-motive race discrimination case in which there was an adverse employment action in which race was a contributing factor. It's the case of an African-American Executive Director, Artur Davis, who hired qualified white subordinates instead of black applicants who were less qualified and then was accused wrongly of creating a Jim Crow atmosphere at Legal Services of Alabama. The employees who made that accusation then conjured up complaints about him creating a hostile working environment, not a sexually hostile working environment, just hostile working environment. Unlike his white comparator, who was the Operations Director prior to him being there, a lady had been accused of creating a hostile working environment by her subordinates who were all white. All of the subordinates of Mr. Davis, African-American, who made the complaints. So, he was met in a parking lot and suspended with pay in violation of internal corporate policy. And this is important. There's case law, as the Court knows, and other circuits saying that internal corporate policy, that an employee handbook is part of the terms and conditions of employment. Well, the employee handbook in this instance said that if there's a complaint against executive-level employees, that it goes to the personnel committee who then makes a recommendation to the full board. That didn't happen here. And what happened instead is very interesting. He was met in the parking lot. He was handed a almost, well, three and a half page letter itemizing a bunch of complaints about him, many of which the board knew were false because he had appeared in front of the board and gotten approval for them in addition to this creation of a hostile working environment. And then they said they had a zero tolerance policy for that. And then they presented him with a resolution that was drafted that day specifically for this situation, creating a whole new policy naming Arthur Davis as the recipient and the sole recipient of that policy. So, they did away with their normal policies and procedures. They exited him. They put him on suspension, paid suspension. They documented him with false accusations. He had been trying to discipline an employee who had blown up at him and screamed at him. And he had gone to the board about that, talked to them about it. They deferred talking about that, didn't tell them, tell him that there had been complaints about him and that they were contemplating suspending him. He learned that by an outside lawyer whom they had called, that they were getting ready to suspend him. He had no idea. So, he was undermining the discipline of that employee. His contract says that he's to be the face of the organization. Right after he was suspended, there was a big event, an event where dignitaries from all over Alabama were invited in, including donors to the organization and members of the press. And he could not be there. And employees were told, if you look at the Gilmore Declaration, that they were to say, when people asked where he was, this is an internal matter we can't discuss. The inference being, gosh, he must have done something gosh-awful wrong. So, his disciplinary notice, this four-page or three-and-a-half-page notice, which is part of the record, was published to a PR consultant who had vowed that he would see to it that Arthur Davis never held public office again. Can I ask you a question about that? Is there anything in the record that indicates that when Legal Services Alabama provided that information to the public relations individual, that they were aware of the, I guess, the vow between Davis and the PR guy? That is not part of the record, Your Honor, to my knowledge. So, I do not know that they knew that. But the simple fact of the matter is they took a personnel record and they published it. Well, I mean, it seems like the PR agent, the PR person, was an agent, was effectively an agent of the Legal Services. There's nothing in the record that says he's their agent. He was supposed to be. Well, it doesn't have to be any kind of formalized name of being bestowed on them of agent. But the relationship, it looks like to me, was an agency kind of relationship under Alabama law. And if it was, would you agree with me that if it was an agency relationship, then there's not a publication? I think that if there was a true agency relationship, for example, if he was an auditor or something that was doing internal stuff for the organization, that that might be the case. This is somebody who could do whatever he wanted to do. And there's no evidence that he was working as their agent. He was to be available to publicize the fact of this disciplinary action. And, in fact, there's evidence to that disciplinary action subsequently. Was he paying or was he getting paid by Legal Services? No evidence on that, Your Honor, in the record. No evidence one way or the other. Was there a contract with Legal Services? I have no evidence that I'm aware of about that, Your Honor. So, Mr. Davis, this resolution, and this is the thing. This is an African-American man who had been complained about by African-American employees. A resolution was passed with the White Operations Director, Ms. Eileen Harris. She was not placed on leave. The complaint went to the Personnel Committee per policy, and nothing ever happened. She was never placed on leave. They draft a resolution specifically naming him, and they say that they are going to hire security. They posted an armed guard on the premises as if he was violent and as if he was going to do something egregious. And there's no evidence that he was ever violent. Yes, sir. Can I get you to move forward a little bit? Sure. The legal issue, I think the legal issue you want us to decide is that contrary to the majority rule, being suspended with pay is an adverse employment action. Exactly. And my question is, why should we do that? Why does the majority not have it right? It's just not an adverse employment action. I think that that rule is that suspension with pay, standing alone, may not be an adverse employment action. But there's also case law that says that employment, that employee policies and procedures are terms and conditions of employment. So suspension with pay, standing alone, I would agree. So somebody is accused of sexual harassment and pursuant to policies and procedures already in place, they're suspended. I don't see a problem with that as long as they're suspended with pay. But here, there's a lot of evidence that it was not pursuant to policy procedure. And not only that, that he was being Why does that matter? Once you admit that a suspension with pay is not an adverse employment action, isn't that the end of it? And you have to come up with some other viable cause of action from the subsequent conduct? No, because the suspension, again, going back, three circuits have suggested an organization's internal guidelines for discipline are inherent components of terms and conditions of employment. So if you're going to do that, do a pursuant to the internal guidelines, and you're fine. They didn't do that here. But that's not the only issue. If, let's say, you suspend with pay an African-American man, and you don't suspend with pay a white comparator similarly situated under Lewis, then you've got a problem. Corporations, private employers have to be consistent in how they handle their policies and procedures. And when they vary from that, they get into problems. And in this, they didn't just suspend him with pay. They banned him from a public event where he was the face of the organization, spawning all kinds of questions about him. They treated him differently from a white comparator. They posted an armed guard as if he did something wrong. He couldn't even access his email during this period of time. A reasonable thing to do would have been to say, okay, we're going to do an investigation. You're suspended with pay. You can work remotely and do your job and do any of that. So it's a real variance here under the facts. And that constitutes an adverse employment action. And again, an adverse employment action under this service law and really under Title VII period, it doesn't have to be something that affects compensation. It simply has to affect the terms, conditions, and privileges of employment. And that's what we have here. Well, that's what you're arguing is your adverse employment, not the suspension then, isn't it? The suspension with the other facts that we have described. You're saying the way that they did this particular suspension. That this was not a normal suspension with pay, but this was an unusual suspension with pay. And the way that they did it made it an adverse employment action. Very unusual. And I want to be clear with the court. I'm not asking this court to make new law. What I'm saying is that this court's opinion in favor of Mr. Davis can be specifically tailored to these facts, to the variances that occurred here. And I want to just commend to the court this resolution. It's document 45-19 that was published. You'll notice the signature. On August 18th, the day he was suspended, where they said in so many words, we're going to do a whole new thing with you, Mr. Davis. They named him in the document, okay? And they mischaracterized their communications with him. And the record is replete with testimony showing that he had permission to do the things that they now say in his letter of suspension that he shouldn't have done. And that, by the way, is 45-20. So it's just a whole different set of facts from your standard suspension with pay. And we're not asking this court to say that any old suspension with pay pursuant to internal corporate policies or an employee handbook is in any way an adverse employment action. But just to be clear, the only issue before us, really, because the only issue that the district court decided is whether the suspension with pay and whatever else might have occurred with it, and whether the alleged constructive discharge were adverse employment actions. I mean, the district court did not go further than that. It just decided those things, right? The district court really didn't decide the issue of mixed motive. And, in fact, there's no briefing from ALS concerning that. But in order to decide the issue of mixed motive, you still have to find that there was an adverse employment action. Yes, Your Honor. So the only issue, really, before us, because the only issue the district court seems to me to have decided is whether these things qualify as adverse employment actions. Would you agree with that or do you think there's something else we need to decide? I think that since the issue of mixed motive discrimination has been briefed, it's within this court's discretion to decide that. The court has two choices. It can decide it here as to whether or not there's an issue of material factors to that or the court can remand to the district court for that. Thank you so much. Thank you. All right. And, Mr. Buckley, you've reserved two minutes. We'll hear from Mr. Vreeland. Al Vreeland on behalf of Legal Services Alabama and two of its members of its board of directors, Ms. Battle and Mr. Smith. If I can start with where Judge Rosenbaum ended. Yes, I think the only issue here on the race discrimination claim is whether there's an adverse employment action. Even with a mixed motive case, Quigley says you have to show an adverse employment action. So the inquiry is focused there. And I don't think the court needs to get into the comparator issues Mr. Buckley raised with Ms. Harris for a couple of reasons. First of all, the only evidence in the record about Ms. Harris is Mr. Davis' testimony that when he started at Legal Services, he was told by another employee that there had been complaints against Ms. Harris. I think the reason that he cites to Ms. Harris is because his argument is that Mr. Davis was suspended with pay outside of the normal terms and that Ms. Harris was dealt with, even though I guess she wasn't suspended with pay, in the normal terms. And, Your Honor, my point is twofold with regard to that. First of all, there's no evidence that the Board of Directors was made aware of these complaints if they were in fact made. And, in fact, I believe Ms. Battle testified she was not aware of those complaints. Second of all, they're not similarly situated in the sense that Ms. Harris was an operations director. She reported to the then executive director, so there were people above her in the organization. Mr. Davis, as the top person in the organization, reports to the Board of Directors. And, obviously, by virtue of that position, there are greater concerns for the Board of Directors' management. Second of all, this is not a case where they went outside the ordinary course and assigned this to some crazy procedure that we're going to let, you know, the person making the accusation decide the investigation or their brother-in-law or something like that. You know, the Board of Directors took great pains to come up with a fair way to review this and hiring Judge Boyd to conduct the investigation. So this wasn't some sort of kangaroo court that showed some signs of this is all set up. And Mr. Davis' brief, you know, focuses on the Davis v. Town Park case, which I think is very helpful because although that didn't involve the same action in terms of being put on paid leave, the court, this court, goes into detail there that, you know, perceived loss of self-esteem, loss of prestige, you know, future impact on this might hurt me down the road when I'm applying for another job are all too speculative and too amorphous concepts to be an adverse employment action. They don't have that threshold level of substantiality that's required. Turning on, and I'm happy to answer any questions about the adverse employment action, but I would like to address some of his comments on the defamation claim. First of all, and I believe Judge Rosenbaum asked if there was known hostility. Ms. Battle testified specifically that she was not aware of Mr. Mowery's prior relationship with Mr. Davis, that he had come recommended to her, but she didn't know anything about the politics involved. Also, Mr. Buckley said that he was paid to publicize, and that, in fact, is the opposite of what he was hired to do. He was hired to manage the media relations. There had been reports. Is there evidence in the record that he was paid? I don't know that there is specific about the pay. Ms. Battle did testify that that's why he was hired. I don't know if the amount of his compensation is actually in the summary judgment record, but what he was retained to do was to manage the media relations because it was expected, based on Mr. Davis' prior comments, that he would go to the media about this. There's even a statement in the letter putting him on paid leave that he had made the threat that he would destroy legal services. So, I think it was a legitimate concern on their part to manage that. There's no evidence that at any point, whether on behalf of legal services or later in some other aspect, that Mr. Mowery ever used the information in this letter to Mr. Davis' detriment. It was given to him for the purpose, the scope of his representation of LSA with regard to media relations. And then, finally, just with regard to the paid leave, I think the Levenstein court is really the most on-point case here. Mr. Davis makes the arguments about the loss of prestige because he was being investigated. You know, Levenstein, you've got a tenured medical school professor, senior in the administration, who's accused of harassment. And he underwent an 11-month investigation. And even there, you know, the Seventh Circuit's comment was however distasteful that might be to have to undergo that kind of investigation. Neither the paid leave nor his decision to quit were adverse employment actions. I'm happy to answer any further questions. Otherwise, I'll save my time. All right. Thank you very much. We'll hear again from Mr. Buckley. Just a few points. It is amorphous as to this person who was hired and given this document that contains pejorative information and false information concerning Mr. Davis. And so there's an issue of material fact there. And matters should be remanded to the district court as far as that is concerned and the defamation claim. If the man's an agent, it may go one way. If he's not, it may go another. It should be reversed and remanded because it is amorphous by argument of counsel here. The second thing is the statement of material facts that is contained in the briefing. And I usually practice in the Northern District of Georgia where we actually have a written separate statement of material facts. But here, apparently that was not required. And Mr. Davis did a prepared, had a statement of material facts, which was a part of his brief. None of the facts alleged and none of the record references in that are disputed. So that needs to be taken at face value. And finally, there has been no argument whatsoever that Mr. Davis has not made out an ex-motive case sufficient for there to be a jury trial in this matter. So in any event, I appreciate the court's time. We are very, very happy that the court decided to hear oral argument on this case. It's great to be back. Thank you so much. Thank you. Thank you. All right.